IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

LUFKIN DIVISION

UNITED STATES OF AMERICA          §
                                  §
V.                                §          NO. 9:07-MJ-28
                                  §
PRIYA RAMNATH                     §

MEMORANDUM RE: BOND PENDING EXTRADITION HEARING

By separate order, the court granted Priya Ramnath's "Motion to Release from

Detention on Conditions."  This memorandum opinion states the court's reasons

underlying that decision.

I.  NATURE OF CASE; PARTIES

This action involves a request for extradition pursuant to an Extradition Treaty

between the Government of the United States of America and the Government of the

United Kingdom of Great Britain and Northern Ireland (hereinafter "Treaty").[1]  The

United States attorney for the eastern district of Texas (hereinafter "government")

acts on behalf of the United Kingdom of Great Britain and Northern Ireland (herein-

after "United Kingdom").

---

[1]      See Extradition Treaty between the Government of the United States
of America and the Government of the United Kingdom of Great Britain and Northern
Ireland, U.S.-U.K., Mar. 31, 2003, S. Treaty Doc. 108-23 (entered into force Apr.
26, 2007).

The government petitions the court to arrest a person accused of committing a crime in the United Kingdom, and to surrender that individual to the United Kingdom for prosecution.  The subject of the United Kingdom's request is Priya Ramnath, M.D.  For convenience, Dr. Ramnath is referred to sometimes as "respondent."[2]

Dr. Ramnath, age 39, is a citizen of India who is fully credentialed, certified and licensed to practice medicine – more particularly the specialty of anesthesiology – in the United States.  She has resided lawfully in the United States since 1996, and most recently, on a temporary nonimmigrant specialty occupation visa.  Her application for permanent residency is pending before the United States Immigration and Customs Enforcement service within the Department of Homeland Security.  Dr. Ramnath resides with her husband and two minor children, all of whom are United States citizens, in Lufkin, Texas, within the territorial jurisdiction of this court.

## II. Proceedings

In November, 2007, the government filed a complaint requesting respondent's arrest pursuant to the Treaty and the United States extradition statute codified in

---

[2]     Case law commonly refers to the requested party in an extradition proceeding as the "respondent."  In re Extradition of Cervantes Valles, 268 F. Supp. 2d 758 (S.D. Tex. 2003).   Commentators apparently prefer the term "relator." M. Cherif Bassiouni, International Extradition: United States Law and Practice (4th ed. 2002).

Section 3184 of Title 18, United States Code.  That complaint alleged that respon-

dent is charged in the United Kingdom with an offense described as "manslaughter

contrary to Common Law on a patient."  According to the complaint, Dr. Ramnath

temporarily worked as a junior resident in training at the Staffordshire General

Hospital in England.  Early in the morning on July 22, 1998, Dr. Ramnath allegedly

injected Patricia Leighton, a patient in the intensive therapy unit, with a bolus of

adrenaline over the objection of two more senior physicians and a senior, experienced

nurse on the critical care team, without obtaining prior permission from the attending

physician with ultimate medical authority in the case, and in disregard of established

hospital protocol for administering adrenaline.  Mrs. Leighton immediately reacted,

went into cardiac arrest, and died.

A manslaughter charge was filed by the Crown Prosecution Service in Stafford-

shire, England on July 31, 2003 – five years after the alleged offense – and an arrest

warrant was issued.  An extradition request was made to the United States Depart-

ment of State in September, 2007, over nine years after the alleged offense.

The government filed its complaint in extradition in this court on November

29, 2007.  Respondent was arrested the next day on November 30, 2007, in Lufkin,

Texas.  She initially appeared before this court the same day, whereupon the court

advised her of the reason for her arrest and the nature of proceedings that would

ensue pursuant to law.  Respondent then was remanded to the custody of the United States marshal.

Thereafter, she retained counsel, and reappeared before the court at a status hearing on December 4, 2007.  Through counsel, respondent moved for bail pending her formal extradition hearing.  That motion was heard in two phases on December 18, 2007, and January 4, 2008.  Counsel for the respondent and government also submitted further argument through written briefs.

### III.  PRINCIPLES OF ANALYSIS

Individual liberties, so carefully protected in domestic criminal proceedings, sometimes must yield to paramount national interests in preserving harmonious working relations with foreign sovereigns.  The federal extradition statute, Title 18, United States Code, Sections 3181 *et seq.*, provides no explicit authority for a district court to admit a respondent to bail.  Thus, bail generally is not available in extradition cases.  See Wright v. Henkel, 190 U.S. 40, 63 (1903); see also In re Extradition of Russell, 805 F.2d 1215, 1216 (5th Cir. 1986).  The rationale for the presumption against bail is to ensure that the United States fulfills its obligation to the requesting country to deliver the suspect.  Wright, 190 U.S. at 62.  Releasing a respondent on bond provides an opportunity to abscond, which would result in "serious embarrassment" to the country and create potential reciprocal noncompliance by other

Page 4 of  49

countries.  Wright, 190 U.S. at 62; see also United States v. Hills, 765 F. Supp. 381,

385 (E.D. Mich. 1991) (citing United States v. Taitz, 130 F.R.D. 442, 444 (S.D.

Cal. 1990)).  As a result, national foreign policy interests often outweigh a respon-

dent's individual liberty interests.  See In re Extradition of Orozco, 268 F. Supp. 2d

1115, 1116-17 (D. Ariz. 2003); In re Extradition of Molnar, 182 F. Supp. 2d 684,

687 (N.D. Ill. 2002).

        Governing circuit law nevertheless recognizes that federal trial courts have

authority to set bail for extradition respondents when appropriate.  See In re Extradi-

tion of Russell, 805 F.2d at 1217.  Generally, there are two prerequisites for setting

bail.  The court must find that the respondent is neither a flight risk nor danger to

any person or the community.  In re Extradition of Molnar, 182 F. Supp. 2d at 687;

In re Extradition of Nacif-Borge, 829 F. Supp. 1210, 1215 (D. Nev. 1993).  The

court also must conclude that "special circumstances" warranting pre-hearing release

exist.  In re Extradition of Russell, 805 F.2d at1216.[3]

        The burden rests with extradition respondents to show by clear and convincing

evidence that they are neither a risk of flight nor a danger to any person or the

---

[3]      Courts differ as to whether analysis properly begins with "risk of
flight and danger" or "special circumstances."  Bassiouni, supra, at 800-01
n.160; see In re Extradition of Molnar, 182 F. Supp. 2d 684 at 687; In re
Extradition of Nacif-Borge, 829 F. Supp. at 1215-16.  Since both showings are
prerequisites, a court logically can address either prong first.

community.[4]  In re Extradition of Gonzalez, 52 F. Supp. 2d 725, 735 (W.D. La.

1999); In re Extradition of Nacif-Borge, 829 F. Supp. at 1215.  In that respect,

extradition respondents are situated similarly to domestic criminal defendants who

are convicted and awaiting sentence or the outcome of an appeal.  See 18 U.S.C. §

3143(a) & (b); In re Extradition of Nacif-Borge, 829 F. Supp. at 1215 (identifying

similarities between Bail Reform Act and bail in extradition proceeding).

Proof that an extradition respondent is neither a flight risk nor a danger is,

without more, an insufficient ground for admission to bail pending an extradition

hearing.  In re Extradition of Gonzalez, 52 F. Supp. 2d at 735.  An additional

requirement is to establish – also by clear and convincing evidence – a special

circumstance or a combination of factors that, in the aggregate, constitute a special

circumstance that creates a compelling case for release on bail.  Wright, 190 U.S. at

63; In re Extradition of Russell, 805 F.2d at 1216; In re Extradition of Gonzalez, 52

F. Supp. 2d at 735 (citing In re Extradition of Nacif-Borge, 829 F. Supp. at 1215);

In re Extradition of Valles, No. M-02-008, 2002 U.S. Dist. LEXIS 26710, at *4 (S.D.

Tex. May 13, 2002) ("cumulation of several factors can constitute special circum-

stances that justify bail in extradition proceedings" (citation omitted)), extradition

denied, 268 F. Supp. 2d 758, 770 (S.D. Tex. 2003); In re Extradition of Nacif-Borge,

---

[4]        "Clear and convincing evidence is evidence that produces . . . a firm
belief or conviction as to the matter at issue. This involves a greater degree
of persuasion than is necessary to meet the preponderance of the evidence
standard; however, proof to an absolute certainty is not required."  Fifth
Circuit Pattern Jury Instructions: Civil, Instruction No. 2.14 (West 2006).

829 F. Supp. at 1216.  Special circumstances can arise under various conditions, and the determination of when such conditions exist is left to the sound discretion of federal trial judges.  In re Extradition of Gonzalez, 52 F. Supp. 2d at 736 (citing Beaulieu v. Hartigan, 554 F.2d 1, 1 (1st Cir. 1977)).

By definition, special circumstances are rare.  While the term is semantically imprecise, a reasonably clear explication was penned by Judge Learned Hand almost a century ago.  He opined that the court's limited power to grant bail in cases involving foreign extradition "should be exercised only in the *most pressing circumstances,* and when the requirements of justice are *absolutely peremptory."*  In re Mitchell, 171 F. 289, 289 (S.D.N.Y. 1909) (emphasis added).  Thus, an extradition respondent's burden is heavy, almost to the point of being unrealistic.

Nonetheless, subsequent jurisprudence suggests that certain conditions or an individual's status may meet this rigorous test.  They include:

1)    Length of proceedings and detention;
2)    Need to consult with counsel;
3)    Health of respondent;
4)    Age of respondent;
5)    Availability of bail to respondent in requesting state or state of arrest;
6)    Likelihood of respondent being found non-extraditable;
7)    Likelihood of success in action in the requesting state; and
8)    Deprivation of religious practices while incarcerated.

Bassiouni, <u>supra</u>, at 802-08; Roberto Iraola, <u>The Federal Common Law of Bail in International Extradition Proceedings</u>, 17 Ind. Int'l & Comp. L. Rev. 29 (2007); <u>see also</u> <u>In re Extradition of Gonzalez</u>, 52 F. Supp. 2d at 735-36.

The United States Bail Reform Act of 1984[5] establishes substantive law and procedures regarding bail for defendants accused of committing crimes within the United States.  This statute does not govern international extradition actions because they are not domestic criminal cases.  <u>In re Extradition of Russell</u>, 805 F.2d at 1217; <u>In re Extradition of Mainero</u>, 950 F. Supp. 290, 293 (S.D. Cal. 1996).  However, the Bail Reform Act uses terminology similar to "special circumstances."  For example, a United States judge may temporarily release an already-detained person for a *compelling reason*.  18 U.S.C. § 3142(i).  Similarly, a person who otherwise would be detained may be released upon a showing, *inter alia*, that there are *exceptional reasons* why detention is inappropriate.  18 U.S.C. § 3145(c); <u>see also</u> <u>United States v. DiSomma</u>, 951 F.2d 494, 496-97 (2d Cir. 1991).  Thus, interpretive jurisprudence regarding these synonymous terms may assist this court in recognizing when a special circumstance justifies release on bail of a person facing extradition.

Purely personal hardships rarely qualify as a compelling or exceptional reason.  <u>See</u> Fed. Bail & Det. Handbook § 13.03; <u>see, e.g.</u>, <u>United States v. Mahabir</u>, 858 F.

---

[5]    Bail Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837 (codified as 18 U.S.C. §§ 3141-3151).

Supp. 504, 508 (D. Md. 1994) ("A defendant's incarceration regularly creates difficulties for him and his family.").  Rather, there must be a truly "unique combination of circumstances giving rise to situations that are out of the ordinary."  DiSomma, 951 F.2d at 497.  Possible examples are: a novel legal question, a question of first impression, an unusual legal or factual question, or a "substantial question . . . in the presence of one or more remarkable and uncommon factors . . . ."  Id.  The Ninth Circuit listed several potential relevant factors in United States v. Garcia, 340 F.3d 1013, 1019-21 (9th Cir. 2003).  These factors are listed in note 6.[6]

## IV.  RISK OF FLIGHT AND DANGER

As acknowledged in the preceding section, the federal Bail Reform Act does not govern.  However, because it articulates factors *universally* relevant to flight risk and dangerousness, the statute provides a helpful framework of reference.  Specifically, the statute requires that courts considering applications for bail take into account the available information concerning (1) the nature and circumstances of the offense charged (including whether the alleged offense is a crime of violence); (2) the

---

[6]    The relevant factors are: (1) the aberrational nature of the defendant's conduct; (2) the nature of the defendant's violent act itself, for example, a lack of specific intent, or highly unusual circumstances surrounding the act; (3) the length of sentence imposed and the length of the maximum sentence; (4) circumstances that would render prison unusually harsh for this particular defendant, for example, serious illness or injury; (5) the nature of the defendant's arguments on appeal, for example, an unusually strong chance of obtaining reversal of conviction or the presence of highly unusual issues or issues not previously decided by the appellate court; and (6) an exceptional unlikelihood that the defendant will flee or constitute a danger to the community.  Garcia, 340 F.3d at 1019-21.

weight of the evidence; (3) the history and characteristics of the person;[7] and (4) the

nature and seriousness of danger to any person or the community that would be

posed by the person's release.  See 18 U.S.C. § 3142(g).

Dr. Ramnath passes scrutiny under these four standards with flying colors.

First, although she is charged with a very serious offense – the maximum punishment

for which in the United Kingdom is life imprisonment – the alleged offense is

involuntary manslaughter.  Technically, this may be a crime of violence, but by

definition it represents an *unintentional* killing of another person.  The sparse facts

now before the court suggest Dr. Ramnath sincerely believed that her patient was *in*

*extremis*, and that desperate, heroic measures should be employed immediately to *save*

the patient's life.  This is not the type of violent behavior that gives a court pause

when deciding whether to admit an accused to bail.

Second, the weight of the evidence against Dr. Ramnath is not great at this

point.  While the government has proffered evidence that most likely satisfies the

legal standard of probable cause, that same evidence raises a real possibility that a

---

[7]     Subsumed within this general category are:
              (A) the person's character, physical and mental condition,
         family ties, employment, financial resources, length of
         residence in the community, community ties, past conduct,
         history relating to drug or alcohol abuse, criminal history,
         and record concerning appearance at court proceedings; and

              (B) whether, at the time of the current offense or arrest, the
         person was on probation, on parole, or on other release
         pending trial, sentencing, appeal, or completion of sentence
         for an offense under Federal, State, or local law.
18 U.S.C. § 3142(g)(3).

United Kingdom jury – taking into account not only the probable cause evidence but all the circumstances in which Dr. Ramnath was placed at the time – will conclude that her conduct did not constitute a *crime against the state*, as opposed to a matter of *civil compensation* to her patient.  The court's reasoning on this factor is discussed in greater detail in Section V.C, <u>infra</u>.

Third, Dr. Ramnath's personal history and characteristics all are exemplary. She has no prior criminal history of any sort.  She is highly educated and skilled.  She has strong community, family, and professional ties to the United States in general and to this jurisdiction in particular.  Indeed, when compared against each history-and-characteristics standard listed above in note 7, nothing reflecting negatively on her is before the court.

Finally, no evidence whatsoever suggests that Dr. Ramnath will pose a danger to any person or the local community if released.  Indeed, release could have an opposite effect.  Were she were allowed to return to her anesthesiology practice, lives of numerous citizens might actually be *saved* rather than endangered.[8]

The government does not oppose Dr. Ramnath's motion for release on the ground that she would constitute a danger.  However, the government devotes a

---

[8]     Evidence before the court suggests that Dr. Ramnath's privileges at Woodland Heights Hospital, Lufkin, Texas, have been suspended pending the outcome of this extradition proceeding and conclusion of legal matters in the United Kingdom.  The court expresses no view on whether, if released on bail, Dr. Ramnath would or should be allowed to resume her former practice.

substantial part of its written and oral arguments to the proposition that the evidence affirmatively establishes that Dr. Ramnath *is* a risk of flight, and, alternatively, that Dr. Ramnath has not established by clear and convincing evidence that she is *not* a risk of flight.  The government rests its argument on the fact that Dr. Ramnath quickly departed the United Kingdom after the event on which the pending charge is based; that she has known charges were pending against her in the United Kingdom since 2004,[9] and has not voluntarily returned to face those charges; and that her husband, Ramnath Seshadrinathan, and professional colleague, Dr. Julio Williams, M.D., both testified in this matter that they would not advise Dr. Ramnath to voluntarily return to the United Kingdom.  The government further bolsters its argument by pointing to the fact that Dr. Ramnath has moved frequently while residing in the United States; that she has lived in Lufkin, Texas, for a period of only six months; and that she no longer has employment ties to the community.[10]

---

[9]     In September 2004, Mrs. Leighton's daughters sent a letter to McAllen Heart Hospital detailing the 1998 incident.  As a result, a complaint was initiated against Dr. Ramnath with the Texas State Board of Medical Examiners alleging "practice inconsistent with public health and welfare."  Therein, Mrs. Leighton's daughters informed the McAllen Heart Hospital that the Crown Prosecution Service was going to pursue manslaughter charges and commence the extradition process.  Their letter also stated that on August 11, 2004, a United Kingdom coroner conducted an inquest and ruled that Ms. Leighton's death was the result of "unlawful killing."

Another similar complaint was initiated in July 2005.  Dr. Ramnath responded to the Texas State Board of Medical Examiners on September 14 & 16, 2004, and July 26, 2005.  The Texas State Board of Medical Examiners does not appear to have taken disciplinary action.

[10]     *See* note 8, <u>supra</u>.

Finally, the government suggests that Dr. Ramnath's current immigration status is pertinent.  The government presented testimony from Mark Low, Special Agent of United States Immigration and Customs Enforcement, that while Dr. Ramnath is lawfully within the United States, she technically is "out of status" with respect to her visa.  Consequently, immigration officials could, within their discretion, lodge a detainer against Dr. Ramnath and take her into custody in preparation for deportation proceedings.  The court perceives the government's point to be that Dr. Ramnath surely realizes that if she is deported and convicted, she may be ineligible to receive a visa for return to the United States.  Thus, if released, she would have an incentive to flee in hopes of never being convicted.

While the government's views are sincerely held, and its arguments are not frivolous, they are not persuasive.  Available information suggests that all of Dr. Ramnath's efforts in the immigration arena are directed toward *remaining* within United States jurisdiction, not *fleeing* it.  Although Dr. Ramnath has relocated several times within the United States and abroad, on each occasion her purpose was to further professional development.[11]  Nothing suggests a nomadic existence designed

---

[11]     Dr. Ramnath graduated from Grant Medical College in Mumbai, India in 1992.  She was a resident in anesthesiology and then a chief resident in anesthesiology at Topiwala National Medical College in India until 1994.  In 1994, Dr. Ramnath moved to the United Kingdom where she worked in a training program at Walsgrave Hospital until 1996. In May 1996, Dr. Ramnath moved from the United Kingdom to the United States to join her husband, and studied for and took and passed all steps of the United States Medical Licensing Examination by 1997.  While applying for admission to a residency in the United States, Dr. Ramnath accepted a temporary position at Staffordshire General Hospital in the United Kingdom in October 1997.  She returned to the United States in late July or early
(continued...)

to defeat creditors, evade detection, or avoid prosecution.  Her residence in Lufkin,

Texas, albeit for less than a year, has been sufficient to establish strong community

and family ties.  She purchased a home where she resides with her husband and

children; she instituted a medical practice that, if allowed to continue, will produce

an annual income of approximately $400,000.00; and she developed close commu-

nity relations, as evidenced by the fact that the spectator gallery has been completely

filled with her supporters and well-wishers at every court hearing after her initial

appearance.

The evidence that Dr. Ramnath left the United Kingdom shortly after the

incident on which the prosecution is based is a concern.  Based on available informa-

tion, however, the court is unwilling to conclude that this evidence establishes that

Dr. Ramnath poses a *serious* risk of flight.  Ramnath Seshadrinathan, respondent's

husband, testified that Dr. Ramnath gave a written, thirty-day notice of intent to

resign from her position at Staffordshire General Hospital *before* the fatal incident.

Thus, her abrupt departure from the United Kingdom may not have been furtive, but

---

[11](...continued)
August 1998, and visited the Cleveland Clinic in Cleveland, Ohio, with respect
to its residency program on August 10, 1998.  She assisted clinic doctors there
on several cases during a three week period.  From July 1999 to June 2003, Dr.
Ramnath was first an intern and then completed her residency  in anesthesiology
at the University of South Florida in Tampa, Florida.  Following that, she was
accepted as a fellow in cardiothoracic anesthesiology at the Cleveland Clinic
from July 2003 to May or June of 2004.  After her fellowship, Dr. Ramnath took
a position at McAllen Heart Hospital in McAllen, Texas.  She recently moved to
Lufkin, Texas to work for a group of anesthesiologists, and immediately prior to
this proceeding, had privileges at Woodlands Heights Hospital in Lufkin and at
Memorial Hospital in Nacogdoches, Texas.

coincidental, or a result of positive developments with respect to Dr. Ramnath's pending United States residency applications.  Such an inference finds some circumstantial corroboration from the fact that she immediately visited and began work at the prestigious Cleveland Clinic in Ohio on August 10, 1998, only 19 days after the incident.  On the other hand, the inference is impugned by Dr. Ramnath's letter to the United Kingdom's General Medical Council dated August 1, 1998.[12]  In that letter, Dr. Ramnath requested cancellation of her registration with the Council due to her resignation from Staffordshire General Hospital.  She stated that her resignation was effective September 2, 1998 and that she gave "months notice to that effect."  In any event, there is no evidence that Dr. Ramnath was aware that she was or might become the subject of a criminal investigation.  Indeed, Dr. Lamb (the attending physician on July 22nd) provided her with a commendatory letter of recommendation on July 28, 1998.  There also is no evidence that she was ever aware then that the United Kingdom had issued an actual warrant for her arrest at any time before she was recently arrested in this proceeding.

Finally, the court must closely scrutinize and evaluate the evidence that Dr. Ramnath presently is advised by her husband and professional colleague, Dr. Williams, to not voluntarily return to the United Kingdom for prosecution.  Upon reflection, the court concludes that this also does not reflect a serious risk of flight.

---

[12]     In order for a doctor to practice medicine in the United Kingdom they are required to register with the General Medical Council.

First, a respondent's resistance to extradition does not automatically equate to evidence of flight risk.  A person who believes that pending criminal charges in a foreign jurisdiction are bogus has every right to contest removal without being automatically branded as a flight risk.  Second, both Ramnath Seshadrinathan and Dr. Williams clearly stated that their advice to Dr. Ramnath is that she abide by any decision of this court regarding extraditability.

Nevertheless, the court must acknowledge that Dr. Ramnath's actions immediately after the United Kingdom incident, her lack of attention to the matter after the complaints to the Texas State Board of Medical Examiners, and present testimony indicating that her closest advisors recommend that she not return to the United Kingdom to face prosecution, constitute at least *some* evidence of risk of flight.  At a minimum, this raises a valid question as to whether Dr. Ramnath has carried her heavy evidentiary burden to show by clear and convincing evidence that she is not a risk of flight.

The presence of some evidence of flight risk does not settle the matter.  Before making a final determination, the court also must consider whether there are conditions of release, with which Dr. Ramnath will abide, that will adequately regulate any risk and reasonably assure her presence at all future court proceedings.  The court concludes from clear and convincing evidence that there are such conditions.  First, the only evidence before the court is that Dr. Ramnath will abide by whatever orders

the court may issue.  Second, the court has a wide array of available conditions of release that, once imposed, will be sufficient to reasonably assure Dr. Ramnath's presence at all future hearings.  Among these are a high appearance bond, fully secured by a cash deposit or federally-approved surety, a home confinement program enforced by electronic monitoring, intensive compliance monitoring by a United States Probation Pretrial Services Officer, and surrender of all family passports and other documents that might otherwise permit international travel.

For these reasons, the court concludes that Dr. Ramnath satisfies her burden to show by clear and convincing evidence that if released pending the formal extradition hearing, she will not constitute a serious risk of flight.

## V.  SPECIAL CIRCUMSTANCES

While Dr. Ramnath is not a serious risk of flight, that fact, without more, is insufficient for the court to admit her to bail.  She must also show by clear and convincing evidence that a special circumstance rebuts the strong presumption for detention.  As earlier noted in Section III, this burden is quite onerous.  Thus, the road to release from this point forward is narrow, winding, and steep.  However, in rare instances the path is passable.

Through counsel, Dr. Ramnath advances multiple points, each proffered as a special circumstance entitling Dr. Ramnath to bail.  Several are ill-chosen, such that

Dr. Ramnath stumbles out of the gate, straining too hard with specious arguments. This section will address and summarily reject these patently gilded points first. Next, analysis will turn to other points of at least colorable merit.  Special consideration then will be given to Dr. Ramnath's strongest point – likelihood of ultimate success.  Finally, the court will make *sua sponte* observations on points not raised or argued by either party, but which the court invited them to consider.

## A.    Specious Arguments

### 1.    "Pandora's Box"

The most egregious "special circumstance" argument is a rhetorical lament that a recent treaty change opens "Pandora's box" for the United Kingdom to prosecute other physicians under similar circumstances.[13]  It is self evident that other physicians might be prosecuted and extradited under similar circumstances.  But if this is intended to be a logical syllogism producing a conclusion that there is a special circumstance warranting bail, something essential is missing.

---

[13]      Before April 26, 2007, the 1976 treaty and the 1985 supplementary treaty between the two sovereigns involved in this action provided that a person could be extradited from the United States only when the statute of limitations for the analogous United States crime had not run.  In 2003, the sovereigns signed a new treaty that went into effect this year providing that extradition requests will be decided without regard to any statute of limitations in either state (Treaty Art. 6), and further providing that the treaty applies to offenses committed before as well as after the date it became effective (Treaty Art. 22).

Assuming *arguendo* that the court were to subjectively agree with Dr. Ramnath's implicit argument that similar prosecutions should not occur, the court would be powerless to remedy such presupposed abuse.  The court's authority is limited to enforcing the treaty and proceeding within narrow limits of the federal extradition statute.  Neither permits the court to refuse extradition when it believes the requesting state's prosecution is ill-advised.

Fundamentally, this point rails against the United Kingdom's prosecution motive, characterized by counsel as "criminalizing the practice of medicine."  The well-established "rule of non-inquiry"[14] prohibits a requested-state court from investigating motives of the requesting state or fairness of the justice system of the requesting state when determining extradition.  In re Extradition of Howard, 996 F.2d 1320, 1329-30 & n.6 (1st Cir. 1993) ("[T]he ratification of an extradition treaty mandated noninquiry as a matter of international comity."); Koskotas v. Roche, 931 F.2d 169, 173-74 (1st Cir. 1991).  Questions relating to fairness or based on humanitarian grounds are in the scope of the executive branch as "[t]he ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct foreign affairs."  Escobedo v. United States, 623 F.2d 1098, 1105 (5th Cir. 1980) (citing Sindona v. Grant, 619 F.2d 167, 176 (2d Cir. 1980);

---

[14]     The rule of non-inquiry is a based on the idea that "[w]e are bound by the existence of an extradition treaty to assume that the trial will be fair" and that as long as probable cause is established, "good faith to the demanding government requires [the respondent's] surrender."  Glucksman v. Henkel, 221 U.S. 508, 512 (1911).

Page 19 of  49

see also Ntakirutimana v. Reno, 184 F.3d 419, 430 (5th Cir. 1999).  Consequently, this argument is devoid of all merit.

   2.   *Ex Post Facto*

   Dr. Ramnath next argues that extradition is barred under principles of *ex post facto.*[15]  This argument is another complaint regarding the treaty change mentioned in the preceding section and described in note 13 above.  It is premised on the fact that the statute of limitations for a federal manslaughter prosecution within the United States is *five* years. 18 U.S.C. § 3282.  The United Kingdom did not request extradition until *nine* years after the alleged offense was committed.  Were the 1976 treaty still in effect, extradition of Dr. Ramnath might be barred.[16]  However, the new treaty revived the United Kingdom's ability to extradite.  Dr. Ramnath perceives this to implicate *ex post facto* principles.

   The first obvious flaw in this argument is that the treaty change in no way criminalized an action that was legal when it was committed.  See Weaver v. Graham,

---

[15]     Literally, *ex post facto* means "from a thing done afterward."  In legal parlance, an *ex post facto* law is regarded as one that impermissibly applies retroactively, especially in a way that negatively affects a person's rights, as by criminalizing an action that was legal when it was committed.

[16]     Dr. Ramnath's assumption might be wrong.  While there is a 5-year statute of limitation for a *federal* manslaughter offense, there is no statute of limitation for a *Texas* manslaughter offense.  Further, in Dr. Ramnath's September 16, 2004 letter to the Texas State Board of Medical Examiners, her counsel argued that the extradition would *not* be time barred.  Gov't Ex. B.  The question remains open, however, because the more analogous Texas offense is criminally negligent homicide for which there is a 3 year statute of limitation. Tex. Code Crim. Proc. Ann. art. 12.01 (Vernon 2007).

450 U.S. 24, 28 (1981); In re Extradition of McMullen, 769 F. Supp. 1278, 1291-92

(S.D.N.Y. 1991) (holding U.S.-U.K. extradition treaty, which retroactively limited

application of political offense exception, did not violate the *ex post facto* clause), aff'd,

953 F.2d 761 (2d Cir. 1992).  Second, the Ex Post Facto Clause of the United States

Constitution[17] refers to limitations on *Congress's* power to enact *criminal laws*.  See

Johannessen v. United States, 225 U.S. 227, 242 (1912).  The clause has no applica-

tion to international treaties or to criminal laws in the United Kingdom.  Neely v.

Henkel, 180 U.S. 109, 122-23 (1901) (holding that *ex post facto clause* has "no relation

to crimes committed without the jurisdiction of the United States against the laws of

a foreign country"); United States ex rel. Oppenheim v. Hecht, 16 F.2d 955, 955

(2nd Cir. 1927) (holding that extradition proceedings are not criminal in nature and

"therefore all talk of ex post facto legislation . . . is quite beside the mark").  Hence,

this argument also provides no basis for barring extradition.

3.      Prejudice Occasioned By Delay in Commencing Prosecution

Dr. Ramnath argues that she has been prejudiced by excessive delay in the

factual investigation (not commenced until over one and a half years after the

incident), in the filing of charges in the United Kingdom (five years after the inci-

dent), and in commencing of extradition proceedings (nine years after the incident).

---

[17]      U.S. Const. art. I, § 9, cl. 3.

While an unfair prejudice argument may have considerable appeal with respect to some aspects of the prosecution, this argument does not constitute a special circumstance or evidence that aids the court in determining whether to release Dr. Ramnath on bail pending extradition.  Requests for dismissal of charges, continuances, and other relief based on prejudice due to excessive delay are appropriately raised in the forum where the criminal action is pending, not in this *sui generis* extradition proceeding.[18]

## B.      Colorable Arguments

### 1.      Dual Criminality

Dr. Ramnath asserts in conclusory fashion that the form of manslaughter charged by the United Kingdom is not recognized under United States law.  Essentially, Dr. Ramnath argues that she is likely to succeed at the extradition hearing because the government will be unable to satisfy its burden of showing "dual criminality."

A requirement for obtaining a certificate of extraditability is a showing by the government that the crime charged against the respondent is covered in the extradition treaty, either by a specific listing or in a catch-all provision.  In addition, that

_____

[18]     In re Extradition of Nava Gonzalez, 305 F. Supp. 2d 682, 689 (S.D. Tex. 2004.) ("[E]xtradition is *sui generis* in nature, neither civil nor criminal.")

crime must be considered a crime by both sovereigns.  Wright, 190 U.S. at 58;

Villareal v. Hammond, 74 F.2d 503, 505-06 (5th Cir. 1934); In re Extradition of

Cervantes Valles, 268 F. Supp. 2d 758, 770 (S.D. Tex. 2003).  Neither the *name* of

the offense nor the *elements* of the crime need be precisely identical.  Rather, only the

*essential character of the criminal transaction* must be the same.  Wright, 190 U.S. at 58;

see also Peters v. Egnor, 888 F.2d 713, 719 (10th Cir. 1989) (holding the crimes

must be "substantially analogous" (citation omitted)); Montemayor Seguy v. United

States, 329 F. Supp. 2d 883, 886 (S.D. Tex. 2004) ("[T]he law only requires that the

crimes be substantially the same.").  Finally, an extradition judge may analyze

whether dual criminality exists by using analogous federal statutes, state laws where

the defendant is found, or a consensus of law of various United States jurisdictions.

Theron v. United States Marshal, 832 F.2d 492, 496 (9th Cir. 1987); Messina v.

United States, 728 F.2d 77, 79 (2nd Cir. 1984).

    The title of the offense lodged against Dr. Ramnath, "manslaughter contrary to

common law of a patient," is couched in arcane terms.  However, in modern judicial

parlance within the United Kingdom, this offense is commonly referred to as

"involuntary manslaughter" and "gross negligence manslaughter," iterations regarded

as synonymous.  See R. v. Adomako, [1995] 1 A.C. 171 (HL) (Eng.); R. v. Misra,

[2005] 1 Cr. App. R. 21 (Eng.); Simon Gardner, Comment, Manslaughter By Gross

Negligence, L.Q.R. 1995, 111 (Jan), 22-27.  The elements of that offense are:

1.      A duty of care owed by the accused to the deceased;
2.      Breach of that duty by the accused;
3.      The breach resulted in the death (causation); and
4.      The breach is to be characterized as gross negligence and there-
        fore a crime.

Complaint Ex. B; <u>see</u> <u>Adomako</u>, [1995] 1 A.C. at 187.[19]

The United Kingdom's offense of involuntary manslaughter is covered by the
treaty at issue in a catch-all provision stating that crimes punishable in both countries
by one year or more are subject to the treaty.  Extradition Treaty art. 2.  Further,
there are United States counterparts in both federal and Texas law.  The federal
manslaughter statute specifically establishes an offense designated as "involuntary
manslaughter."[20]  The potential punishment therefor is not more than 6 years, a fine,
or both.  18 U.S.C. § 1112(b).  The elements of proof for the offense are:

1.      The defendant killed the person as charged;
2.      The killing occurred within the special maritime and territorial
        jurisdiction of the United States;

---

[19]      In <u>Misra</u>, wherein the United Kingdom Court of Appeal interpreted
<u>Adomako</u>, the court rephrased the elements as follows:

> "The offence requires, first, death resulting from a
> negligent breach of the duty of care owed by the
> defendant to the deceased; second, that in negligent
> breach of that duty, the victim was exposed by the
> defendant to the risk of death; and third, that the
> circumstances were so reprehensible as to amount to
> gross negligence."

<u>Misra</u>, [2005] 1 Cr. App. R. at 48.

[20]      The federal involuntary manslaughter offense is defined as "the
unlawful killing of a human being without malice. . . . [i]n the commission . .
. without due caution and circumspection, of a lawful act which might produce
death." 18 U.S.C. § 1112(a).

3.    The defendant did so unlawfully (i.e., without justification or excuse); and

4.    The defendant acted with gross negligence and had either actual knowledge or reason to know that his conduct was a threat to the lives of others.

See United States v. Browner, 889 F.2d 549, 553 (5th Cir. 1989); United States v. Fesler, 781 F.2d 384, 393 (5th Cir. 1986).

Texas law establishes a substantially equivalent offense titled "criminally negligent homicide." The offense occurs when a person "causes the death of an individual by criminal negligence." Tex. Stat. Ann. § 19.05(a) (Vernon 2007). It is punishable as a state jail felony, which is imprisonment in a state jail for 180 days to 2 years and a fine of up to $10,000. Id. §§ 12.33 & 19.05(b). The Texas Penal Code defines "criminal negligence" as follows:

> A person . . . is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a *gross deviation from the standard of care that an ordinary person would exercise under all the circumstances* as viewed from the actor's standpoint.

Id. § 6.03(d) (emphasis added).

Finally, criminal prosecutions of physicians throughout the United States for manslaughter, although rare, do occur. A representative sample of such cases appears

in the note.[21]  Of particular relevance to the point now under consideration is

Hampton v. State, wherein the court stated:

> The law seems to be fairly well settled, *both in England and America*, that where the death of a person results from the criminal negligence of the medical practitioner in the treat-ment of the case the latter is guilty of manslaughter . . . .

39 So. 421, 423-24 (Fla. 1905) (emphasis added).  In summary, then, it is clear that

the essential character of the conduct criminalized is the same under both United

Kingdom and United States laws (state and federal).  Therefore, the "dual criminal-

ity" standard is met, and Dr. Ramnath's assertion that a special circumstance exists

because "dual criminality" is not present must, therefore, be rejected.


      2.    Availability of Bail


     Availability of bail in the requesting state for the underlying crime has been

recognized as a special circumstance justifying pre-hearing bail in the requested state.

In re Extradition of Gonzales, 52 F. Supp. 2d 725, 736 (W.D. La. 1999); In re

Extradition of Nacif-Borge, 829 F. Supp. at 1221.  Dr. Ramnath asserts that bail is

---

[21]  See United States v. Wood, 207 F.3d 1222, 1234 (10th Cir. 2000) (reversing and remanding conviction due to error but holding that the evidence was sufficient to support physician's conviction for involuntary manslaughter); Green v. Abrams, 984 F.2d 41, 45-46 (2d Cir. 1993) (affirming district court's denial of writ of habeas corpus upon holding that there was sufficient evidence to support physician's conviction for criminally negligent homicide under N.Y. state law); Grotti v. State, 209 S.W.3d 747 (Tex. App.—Fort Worth 2006, pet. granted) (affirming conviction of physician for criminally negligent homicide); Commonwealth v. Youngkin, 427 A.2d 1356, 1360-61 (Pa. Super. Ct. 1981) (affirming physician's conviction of involuntary manslaughter for the manner he prescribed a prescription drug); Gian-Cursio v. State, 180 So.2d 396 (Fla. App. 1965) (affirming convictions of physicians for manslaughter).

available to her in the United Kingdom.  The only evidence tendered in support of this assertion is the United Kingdom's Extradition Act of 2003 (which provides that a person being extradited from the United Kingdom to another country may be granted release on bail upon proof of "exceptional circumstances") and a proffer that one James Lewis, a Queen's Counsel in the United Kingdom, would testify that there is now a presumption for bail in international extradition proceedings in the United Kingdom.

The United Kingdom's Extradition Act provides a heightened standard facially identical to that applied in United States extradition cases.  Any argument based on it, therefore is circular, bootstrapping, and unhelpful.  Worse, it is not relevant.  The question is not whether a person facing *extradition* would be entitled to bail; rather, the question is whether a person facing *manslaughter* in the United Kingdom would be admitted to bail.

Aside from Dr. Ramnath's *ipse dixit* statement, there is no evidence that bail for a manslaughter defendant routinely is available.  Rather, the evidence before the court suggests the opposite.  The United Kingdom's arrest warrant issued for Dr. Ramnath has a designated place for inserting the amount of bail established for the defendant.  That space is affirmatively struck through.  Further, even if bail routinely is granted to resident manslaughter defendants, there is no basis for the court to assume that such bail would be available to a non-resident, non-citizen who avoided

returning to the United Kingdom after learning of pending criminal charges, and who resolutely resisted formal extradition.

For these reasons, the court is unwilling to hold that availability of bail in the requesting state is a special circumstance compelling pre-hearing release of the respondent.

3.  <u>Lengthy Delay</u>

Dr. Ramnath suggests that there likely will be an extensive delay of the extradition hearing and subsequent appeal.  If this be true, it can be a special circumstance warranting release pending the extradition hearing.

Dr. Ramnath argues that there will be an extended delay for the extradition hearing because *she* will need additional time to research the issues prior to the hearing.  Dr. Ramnath also foresees that if bail is granted, the *government* will likely appeal or file an immigration detainer, each of which would also cause delay.  Finally, she foresees an appeal of the extradition decision itself.

The court is unconvinced that there will be excessive delay.  The government states that it is ready for the extradition hearing now.  While a reasonable time for Dr. Ramnath to prepare for the hearing is due, such preparation should not require a huge amount of time, given the abbreviated nature of the hearing.  An extradition

proceeding is not a plenary trial; it is to determine only whether the respondent is extraditable.  <u>Montemayor Seguy</u>, 329 F. Supp. 2d at 888.  The nature of evidence that a respondent may introduce is quite limited, and general discovery regarding merits of the prosecution is unavailable during the extradition phase.  <u>Id.</u>  Defensive investigation and defensive evidence must await proceedings in the underlying case in the United Kingdom.  <u>See</u> <u>id.</u>

Second, only *unusual* delay qualifies as a special circumstance warranting bail. "[N]ormal passage of time inherent in the litigation process" is not the type of delay that amounts to a special circumstance.  <u>United States v. Kin-Hong</u>, 83 F.3d 523, 525 (1st Cir. 1996).

Finally, the bulk of the hypothesized delay – should it occur – will have been caused by Dr. Ramnath's own tactical actions.  It is inconsistent for Dr. Ramnath to argue that a delay caused by her should qualify as a special circumstance justifying her release.  <u>See</u> <u>In re Extradition of Rovelli</u>, 977 F. Supp. 566, 569 (D. Conn. 1997).

For these reasons, arguments that excessive delay constitutes a special circum-stance warranting release are not accepted.

C.      **Likelihood of Success**

An extradition respondent can prove a special circumstance warranting admission to pre-hearing bail by showing a likelihood that the respondent will be found non-extraditable, or by showing a likelihood of success in the action in the requesting state, or both.  Such showings require proof that the requested state is unlikely to establish probable cause that the respondent committed the crime charged, or that the requesting state cannot prove the elements of the charged crime beyond a reasonable doubt.  Dr. Ramnath asserts both grounds.

Evaluating these grounds requires fact-specific analysis.  Accordingly, the court must first review and summarize the factual evidence that the government intends to present at the formal extradition hearing.

1.      Factual Background

In July, 1998, Patricia Leighton, age 51, was admitted to Cannock Chase Hospital in Staffordshire, England, for treatment of complications from surgery on a bunion on her foot the month before.  Upon admission, Mrs. Leighton had rheuma-toid arthritis, an infected toe, and a septic ingrowing toenail.  She was diagnosed with an infection of the bone of the foot and was treated with antibiotics.

Over the next two days, Ms. Leighton's condition rapidly deteriorated.  Her septic ingrown toenail was removed; she developed severe pain; she vomited; her temperature increased, and she had very low blood pressure.  She was given a blood transfusion.  Notwithstanding these conservative therapies, Ms. Leighton's condition worsened.  She was diagnosed as being in septic shock, a very serious and life-threatening condition.[22]

In view of this dire condition, she was transferred at approximately 3:00 a.m. on July 22, 1998, to Staffordshire General Hospital for admission to Staffordshire's intensive therapy unit (ITU).  There, a critical care team was assembled immediately.  Doctor Andrew Stephen Theakston Lamb was assigned to the case as the on-call Consultant Anaesthetist for the hospital.  As such, he was the United States equivalent of an attending physician with ultimate authority to manage and make decisions regarding the patient's care.  Apparently, he never was physically present at the hospital during Ms. Leighton's brief admission, but he was contacted at least once by telephone.  Doctor Doris Hui Lan Ng was the Registrar for the unit.  The United States equivalent of this position is "senior resident in-house."  Doctor Benjamin

---

[22]     In lay terms, septic shock is a "serious condition that occurs when an overwhelming infection leads to low blood pressure and low blood flow.  The brain, heart, kidneys, and liver may not work properly or may fail. . . . Septic shock is a medical emergency," usually requiring the patient to be admitted to a hospital' intensive care unit. MedlinePlus, Medical Encyclopedia: Septic Shock, http://www.nlm.nih.gov/medlineplus/ency/article/000668.htm (2007).    "About 750,000 people in the United States get severe sepsis each year, and more than 200,000 people die from it."    MayoClinic, Infectious Disease: Sepsis, http://mayoclinic.com/health/sepsis/DS01004 (2007).

Mba was the Senior House Officer, responsible for Mrs. Leighton's admission to the unit and her immediate care.  The United States equivalent of this position is "hospitalist."  Doctor Ramnath, who at the time was thirty years old, was the on-call Senior House Officer Anaesthetist.  The United States equivalent of this position is "junior resident."[23]  In addition, there were two senior nurses, Sister Grundy, the nursing sister in charge of the ITU, and Staff Nurse Pedley, an experienced staff nurse.

During the initial ITU assessment, Mrs. Leighton's heart rate appeared to be dangerously low.  Dr. Ng and Sister Grundy believed they were not getting adequate readings.[24]  Dr. Ramnath and Dr. Mba then both attempted to insert an arterial cannula to get an accurate measure of Mrs. Leighton's blood pressure.  However, neither physician succeeded, possibly due to the patient's extremely low blood pressure.  Notwithstanding that failure, Ms. Leighton was given intravenous colloids (fluids) under pressure in an effort to increase her blood pressure.

A disagreement between the doctors and nurses over what to do next arose.  Dr. Ng stated that a central venous line should be inserted to get a more accurate

---

[23]     Characterizations of Dr. Lamb as an attending physician, of Dr. Ng as a senior resident, of Dr. Mba as a hospitalist and of Dr. Ramnath as a junior resident are based on testimony of Dr. Julio Williams, M.D., a United States cardio-thoracic surgeon who testified in Dr. Ramnath's behalf at one of the hearings conducted in this matter.

[24]     Apparently, Dr. Ng and Sister Grundy thought that Ms Leighton's physical symptoms and appearance did not correspond with the *in extremis* signs indicated by the monitor. Complaint Ex B.

measurement of Mrs. Leighton's blood pressure, and so that fluids could be provided more effectively to raise her blood pressure.  Dr. Ramnath, however, thought the patient to be already beyond that point, and she argued instead that Mrs. Leighton should be given an intravenous bolus of adrenaline.  Dr. Ng, Dr. Mba, and Sister Grundy disagreed.  Dr. Ng repeated that fluid replacement was appropriate first, and if that did not raise the patient's blood pressure, they should then consult Dr. Lamb about the advisability of administering titrated doses of adrenaline.

No consensus was reached.  Shortly thereafter, Dr. Ramnath injected Mrs. Leighton with 3 milliliters of adrenaline.  Mrs. Leighton reacted immediately.  She became agitated, bolted upright, shouted, and appeared distressed.  Then, she became nonresponsive, stopped breathing, and went into cardiac arrest.  Cardio pulmonary resuscitation (CPR) was begun.  Dr. Ramnath intubated the patient.  More adrenaline was given intravenously.  All efforts were unavailing, and about 25 minutes later, Mrs. Leighton was certified dead.

The following day, Dr. Ramnath spoke with Dr. John Hawkins, a Consultant Anaesthetist and the Director of the Staffordshire ITU.  In that interview, she allegedly stated that in hindsight, the situation had not been as urgent as she had originally believed; that there was time for further monitoring and more conservative therapy; and that she was wrong for injecting Mrs. Leighton with adrenaline without

first contacting Dr. Lamb and securing his approval.  She also reportedly admitted to Dr. Mba that perhaps she should not have given the patient adrenaline.

Dr. Lamb, Dr. Hawkins, Dr. Lakshman Karalliedde, a consultant toxicologist, and Professor Alexander Robert Walker, an expert, all subsequently stated that Dr. Ramnath's administering of adrenaline to Mrs. Leighton violated the hospital's established protocols.[25]  In addition, they opined that Dr. Ramnath should have listened to the other physicians, and if an agreement could not be reached, a senior physician should have been consulted.

The day following Ms. Leighton's death, July 23, 1998, a post mortem examination was conducted.  In the opinion of Dr. Valerie Suarez, Consultant Histopathologist, Mrs. Leighton's death was due to natural causes, and she would have died if untreated.  However, Dr. Suarez stated later that she is unable to say whether the death was due to natural causes because she was not aware of all the circumstances surrounding the incident at the time of the autopsy.  Complaint Ex. B.

Dr. Ramnath wrote Dr. Lamb a letter in June, 1999, detailing her account of the incident.  Therein, she indicated that she gave only 1 milliliter of a 1:10,000 solution of adrenaline.

---

[25]     They concurred that adrenaline generally is administered in three sets of circumstances: (1) cardiac arrest (treated with injection of large dose); (2) anaphylactic shock (treated with injections of 1 ml of 1:10,000 adrenaline, and repeated if necessary); and (3) heart failure (treated with controlled infusion of diluted form).

Page 34 of  49

The police did not begin a criminal investigation of the incident until some-time in February, 2000, or seventeen months after the fact and of Ms. Leighton's cremation.  Formal charges were not filed until July, 2003, five years after the incident.  The United Kingdom did not make a formal extradition request to the United States until September, 2007, over nine years after the incident.

2.    Probable Cause

At an extradition hearing the government's burden is to show the existence of several factors listed in the note below.[26]  The only factor that Dr. Ramnath disputes (other than the "dual criminality" requirement already examined) is whether proba-ble cause exists to believe the respondent committed the charged crimes.

A finding of probable cause is required by the federal extradition statute, 18 U.S.C. § 3184.  Procedurally, courts apply the federal standard of probable cause.

---

[26]    Factors a judge must examine in an extradition hearing are:

1)    Personal and subject matter jurisdiction;
2)    Whether there exists a valid extradition treaty between the United States and requesting state;
3)    Whether criminal charges are pending in the foreign state;
4)    Whether the respondent is in fact the person accused;
5)    Whether crimes charged are encompassed within the treaty; and
6)    Whether probable cause exists to believe the respondent committed the crimes charged.

See In re Extradition of Demjanjuk, 603 F. Supp. 1468, 1470 (N.D. Ohio 1985), appeal dismissed, 762 F.2d 1012 (6th Cir. 1985); Glenn W. MacTaggart, Determining the Extraditability of Fugitives, Fed. Law., Feb. 2004, at 26, 29; Bassiouni, supra, at 820.

United States v. Wiebe, 733 F.2d 549, 553 (8th Cir. 1984); see also Garcia-Guillern v. United States, 450 F.2d 1189, 1192 (5th Cir. 1971); Jimenez v. Aristeguieta, 311 F.2d 547, 562 (5th Cir. 1962).  The government is not required to present evidence sufficient to convict.  Rather, the government need only present competent legal evidence to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief in the guilt of the accused.  In re Extradition of Cervantes Valles, 268 F. Supp. 2d at 772; Coleman v. Burnett, 477 F.2d 1187, 1202 (D.C. Cir. 1973).  Stated another way, the government must present competent evidence sufficient to justify holding an accused to await trial, not evidence sufficient to justify a conviction.  Collins v. Loisel, 259 U.S. 309, 316 (1922).

Substantively, the government's probable cause evidence must support every element of the charged offense.  Those elements were stated earlier in Section V. B, including note 19, and now must be examined in light of the factual evidence before the court.  The court will make a formal probable cause determination at the extradition hearing itself.  However, Dr. Ramnath's "special circumstance" argument premised on likelihood of success at the extradition hearing requires the court to make an educated guess at this stage.

It is not likely that Dr. Ramnath will succeed in persuading the court that probable cause is absent.  First, since Dr. Ramnath was a member of the critical care team assembled to provide medical care to Ms. Leighton in Staffordshire Hospital's

Page 36 of  49

intensive therapy unit, she unquestionably owed a duty to Ms. Leighton commensu-
rate with the duty that all physicians owe to patients.  Second, a fair and impartial
person of ordinary prudence and caution could conscientiously entertain a reasonable
belief that Dr. Ramnath breached that duty by injecting adrenaline in disregard of
established and normal protocols for septic shock therapy.  Third, such a person
could conscientiously entertain a reasonable belief that there was a causal nexus
between the injection of adrenaline and Ms. Leighton's death, given her immediate
agitation, shouts, and cardiac arrest, and the additional evidence from Dr.
Karalliedde, and Professor Forrest, who opined that there is no doubt but that
injection of adrenaline caused death.  Complaint Ex. B.  Finally, such a person could
conscientiously entertain a reasonable belief that Dr. Ramnath's conduct was gross
negligence given that she acted over the objection of two higher ranking physicians
on the treatment team, and ignored an experienced nurse's suggestion that the heart
monitor machine was providing a false reading.

        The court, therefore, declines to conclude at this point that Dr. Ramnath likely
will succeed in having the court certify to the United States Department of State that
she is not extraditable.

### 3.      Defending the Case in the United Kingdom

While the government appears likely to satisfy easily its threshold *probable cause* burden at the extradition hearing, proving the respondent's *guilt* beyond a reasonable doubt at a plenary trial in the United Kingdom will be quite a different matter.  Based on the sparse facts now before the court, the Crown Prosecution Service will soon find that this case resurrects and reaffirms the colloquial adage that "the devil is in the details."  When those details are considered, it is apparent that Dr. Ramnath can mount a strong defense.  This observation was conceded even by the government's attorney at the last evidentiary hearing on January 4, 2008.

The first obstacle to a successful prosecution stems from the serial and extraordinary delays in investigating the matter, bringing the charge and requesting extradition.  In the aggregate, they constitute almost a decade.  Excessive delay alone signals a weak case.  See In re Extradition of Molnar, 182 F. Supp. 2d at 689.  Moreover, in a fact-specific medical matter such as this, there undoubtedly will be a stongly-urged pretrial motion to dismiss based on unfair prejudice to the defendant occasioned by delay.  The inference of weakness is strengthened by the fact that barely one in three manslaughter prosecutions of physicians in the United Kingdom ultimately succeed.[27]

---

[27]      It was reported in 2006 that, while the number of doctors charged with manslaughter in the United Kingdom had increased steeply since 1990, the
(continued...)

Second, if Dr. Ramnath presents credible expert medical testimony that her
actions constituted proper medical practice – as she attempted to do in this court
through Dr. Julio Williams – the breach of duty (negligence) element may not be
established at trial.  Her letter in June of 1999 asserts that she injected adrenaline in
the quantity that Drs. Lamb, Hawkins, and Karalliedde, and Professor Forrest
indicated to be appropriate in certain instances of shock.

Third, with respect to gross negligence, the seminal involuntary manslaughter
case in the United Kingdom, Adomako, and its progeny, Misra, heavily emphasize
that a defendant's conduct must be evaluated in light of *all the circumstances in which
the defendant was placed when a breach of duty occurred*.  If, as Dr. Ramnath now asserts,
the propriety of her actions are at least debatable among physicians of reason,[28] and
were induced by a usually reliable mechanical monitor indicating that the patient was
*in extremis* to the point that more drastic and immediate measures than normally
employed were necessary, it seems unlikely that a fair, impartial, and properly

---

[27](...continued)
conviction rate was only about 30%.  R.E. Ferner & Sarah E. McDowell, Doctors
Charged With Manslaughter in the Course of Medical Practice, 1795-2005: A
Literature Review, 99 J. Royal Soc'y Med. 309, 310 (2006).

[28]   The court's lay study of septic shock management indicates that
infusion of colloidal fluids, use of an arterial cannula and a central venous
line (for both diagnosis and treatment), intubation and injection of adrenaline
are all recognized and regularly employed procedures.  Their sequence and
propriety would depend, of course, on the particulars of any given case and
physician expertise.  These same procedures were utilized or considered in Ms.
Leighton's case.  It is highly unlikely, therefore, that Dr. Ramnath could be
accused of outright quackery, and, conversely, quite likely that there was room
for legitimate disagreement as to whether and when to use any or all of these
procedures.

instructed jury would find Dr. Ramnath's conduct so bad in all the circumstances as to amount in their judgment to a criminal act.

Further explication of this conclusion is necessary.  While "gross negligence" is the *mens rea* element of the federal manslaughter statute, it is more commonly employed in civil tort litigation in the United States where a finding of such entitles a plaintiff to recover exemplary damages.  For purposes of involuntary manslaughter in the United Kingdom, however, the term connotes much more reprehensible conduct than that affecting civil liability.  In <u>Adomako</u>, Lord Mackay quoted with apparent approval the opinion of Lord Hewart C.J. in <u>Rex v. Bateman</u>, 19 Cr.App.R. 8, 11-12, who said:

> [T]he facts must be such that, in the opinion of the jury, the negligence of the accused *went beyond a mere matter of compensation between subjects* and showed such disregard for the life and safety of others as to amount to a crime against the state . . . .

<u>R. v. Adomako</u>, [1995] 1 A.C. 171, 184 (HL) (Eng.) (emphasis added).  Similarly, in <u>Misra</u>, the court embraced commentary of Sir John Smith, Q.C., who explained in his treatise that in this category of manslaughter, "negligence sufficient to found civil liability is not necessarily enough."  <u>R. v. Misra</u>, [2005] 1 Cr. App. R. 21, at 42 (Eng.) (citing J.C. Smith & Brian Hogan, <u>Criminal Law</u> 378-85 (10th ed. 2002).

Most significantly, in <u>Misra</u>, the court affirmed a trial court's post-<u>Adomako</u> direction to the jury which was as follows:

Page 40 of  49

"[D]uty and breach of duty . . . will be the starting point to establish civil liability to pay damages. But as you would expect, and is the law, *the prosecution must make you sure of something much more, and much more serious, than that before a person can be convicted of the crime of manslaughter.* That is why you see in the indictment the words 'gross negligence'. *Mistakes, even very serious mistakes, and errors of judgment, even very serious errors of judgment, and the like, are nowhere near enough* for a crime as serious as manslaughter to be committed. . . .

Over the years, the courts have used a number of expressions to describe this vital element of the crime, but the key is that it must be *gross in the perhaps slightly old-fashioned sense now of the use of that word*. So in this case, when you are considering the conduct of each doctor, I think you will find it most helpful to concentrate on whether or not the prosecution has made you sure that the conduct of whichever one you are considering in all the circumstances you have heard about and as you find them to be, fell so far below the standard to be expected of a reasonably competent and careful senior house officer that it was something, in your assessment, *truly exceptionally bad*, and which showed such an indifference to an obviously serious risk to . . . life . . . and such a departure from the standard to be expected as to amount, in your judgment, to a criminal act or omission, and so to be the very serious crime of manslaughter."

<u>Misra</u>, [2005] 1 Cr. App. R. at 25-26.  Unless the evidence available to the United

Kingdom prosecutor is considerably stronger than the evidence proffered to this

court, there is a substantial probability that a conscientious jury considering this case

in light of all the circumstances – including the complete absence of the attending

physician at a critical time – will not conclude that Dr. Ramnath's conduct was "truly

exceptionally bad" or reflected "indifference to an obviously serious risk of life" or

was such a departure from the expected standard as to constitute a criminal act.

A jury might or might not conclude that Dr. Ramnath made a very serious mistake based on a very serious error in judgment. However, as the foregoing instruction teaches, such evidence is nowhere near enough for a crime as serious as the United Kingdom's version of involuntary manslaughter to be committed.

Before departing this subject, the court notes with interest that *three* physicians originally were charged and convicted of involuntary manslaughter in <u>Adomako</u>. Before the case even reached Lord Mackay, the Court of Appeal sustained the appeals of two physicians and their convictions were quashed. The evidence as to them, like the evidence pertaining to Dr. Adomako, reflected that they had gone dreadfully wrong in their handling of the deceased patient. Nevertheless, they were not *criminally* liable because they were inadequately trained and supported for the tasks demanded of them. This precedent likely will haunt Dr. Ramnath's prosecutor who must now ponder and defend the assertion that the presence of a malfunctioning monitor and the absence of the attending physician in overall charge of Ms. Leighton's care constituted inadequate support of Dr. Ramnath for the tasks demanded of her.

For all these reasons, the court concludes that Dr. Ramnath clearly and convincingly has demonstrated a substantial likelihood of success in the action in the requesting state.

D.    *Sua Sponte* Observations

In Section III, <u>supra</u>, the court observed that the United States Bail Reform

Act contemplates that persons ordinarily detained before or after conviction may

nevertheless be released on rare occasions for a "compelling reason" or in an "excep-

tional circumstance."  Because those terms appear semantically and analytically

synonymous with the term "special circumstance" employed in extradition jurispru-

dence, the court earlier observed that Bail Reform Act cases may illuminate the

special circumstance inquiry.  The court then cited six specific factors identified by

the Court of Appeals for the Ninth Circuit in <u>Garcia</u> as instructive for determining

when an exceptional circumstance is present.  <u>See</u> note 6.

Even a cursory review reveals that Dr. Ramnath easily can show that four of

the six factors would warrant an exceptional circumstance finding were this a domes-

tic criminal case.  First, Dr. Ramnath's alleged behavior in 1998 is truly aberrational

in nature.  (Factor 1.)  Aside from complaints stemming from that one incident, Dr.

Ramnath has received nothing but glowing evaluations from every hospital where she

has worked, including one from Staffordshire General Hospital.  Dr. Lamb, the

attending physician in Ms. Leighton's unfortunate case, even wrote a commendatory

reference letter for Dr. Ramnath on July 28, 1998.[29]  Similarly, a doctor working at

---

[29]        Dr. Lamb subsequently stated that at the time he wrote the letter,
he was not aware of all the circumstances. Complaint Ex. B.

the Cleveland Clinic, where Dr. Ramnath assisted for three weeks immediately

following her resignation from Staffordshire General Hospital, wrote a reference letter

stating:

> "[S]he is extremely professional and diligent, as well as
> enthusiastic and humble about the scope of learning in
> anesthesia and critical care.  Surely, Dr. Ramnath would
> make an outstanding chief resident or fellow for her maturity
> and graciousness in representing and speaking for other
> residents or fellows."

Resp't Ex. 14.

Second, the very title of the alleged crime – *involuntary* manslaughter – presup-

poses lack of specific intent to harm.  (Factor 2.)  All evidence points to the conclu-

sions that Dr. Ramnath's actions were taken with the intention of *saving* a life, not

taking one.  In addition, the apparently malfunctioning and severely misleading heart

monitoring machine, coupled with a medical emergency at 3:00 a.m. (when the

attending physician was not present) smack of highly unusual circumstances sur-

rounding the alleged criminal act. (Factor 2.)

Third, while the maximum penalty in the United Kingdom for this charge is

life imprisonment, the likely punishment – should Dr. Ramnath be convicted – is

light.  (Factor 3.)  In R. v. Misra, [2005] 1 Cr. App. R. 21 (Eng.), a recent case with

some striking similarities to the present one, a physician convicted of manslaughter

was sentenced to only 18 months' imprisonment, *suspended* for 2 years.  He subsequently was permitted to resume his medical practice under specified conditions.[30]

Finally, there is an exceptional unlikelihood that Dr. Ramnath will flee or constitute a danger to the community.  (Factor 6.)  As previously concluded in Section IV, Dr. Ramnath does not present a risk of flight or danger to any person or the community.  Moreover, when the apparent light consequences of being convicted in the United Kingdom are contrasted with the much more severe penalty in the United States for failing to appear or surrender,[31] Dr. Ramnath's high intelligence surely will allow her to conclude that drinking from the United Kingdom's cup is her less bitter option.

These factors would propel a United States court to find the existence of exceptional circumstances in a domestic case.  Thus, they also weigh in favor of the court finding that a special circumstance relevant to bail exists in this action.

---

[30]    *See* Outrage Over Doctor's Return, Birmingham Post (U.K.), Dec. 1, 2007, *available at* 2007 WLNR 23719281.

[31]    Under 18 U.S.C. 3146(b), a person who fails to appear when required, or to surrender to serve a sentence in a case wherein the maximum sentence is 15 or more years, may be fined $250,000 and sentenced to ten years imprisonment, consecutively to any other sentence.

## VI. DECISION

Having conscientiously considered every point presented by the parties – and others *sua sponte* – the court is at last emancipated from minutiae and freed to reach the heart of the matter.  Dr. Ramnath has shown by clear and convincing evidence that she is not a risk of flight or danger if released.  She has made a similar showing of one or more special circumstances that precedent deems sufficient for admitting an extradition defendant to bail.  Thus, she satisfies formal prerequisites for a favorable ruling.

However, it does not automatically follow that release is proper.  The pivotal questions must still be answered giving due respect to Learned Hand's seminal expressions.  Does Dr. Ramnath's case involve "most pressing circumstances?"  Do "absolutely peremptory" requirements of justice counsel for her release?

Answering these questions correctly requires heavy-duty rumination.  The task is difficult because the term "special circumstance" necessarily is indeterminate.  Any effort to define it more explicitly would result in what Lord Mackay described in <u>Adomako</u> as a "spurious precision."  Thus, the appropriate disposition here necessarily rests – heavily – on the proper exercise of sound discretion of the undersigned United States judge charged with making the decision.

In this instance, that exercise is aided by the meticulous findings and conclu-sions above, and also by wisdom of the ages reflected in various profound utterances that resonate with acute relevance to the task at hand.

*Pacta sunt servanda.*

*Justice is as strictly due between neighbor nations, as between neighbor citizens.*

———————————————

The Latin brocard above, meaning "promises must be kept" arguably is the oldest and most fundamental principle of international law.  Without such a rule, no international agreement would be binding.  The second statement, attributable to Benjamin Franklin,[32] is a folksier, colloquial reiteration of the same idea.  These serve to keep the court mindful that faithful adherence to governing law requires that it show due respect to the settled rule that in matters of international relations, rights of sovereigns generally triumph over individual liberties to which an accused other-wise would be entitled.

*If the law supposes that . . .the law is a ass – a idiot.*

*Laws in themselves are not absolute.*
*They must yield to the just and well-trained conscience.*
*The true man of law . . . can be recognized by his skill in*
*interpreting legal texts with a view toward the higher welfare*
*of the individual and of the community.*

———————————————

———————————————

[32]     Benjamin Franklin, Letter to Benjamin Vaughan, <u>reprinted in</u>, <u>The Works of Benjamin Franklin, Vol. XI</u> 16 (John Bigelow ed., 1904).

Page 47 of  49

The rude and profane statement is that of the fictional "Mr. Bumble," commenting on the ancient English common law of coverture in Charles Dickens's <u>Oliver Twist</u>.  The more reverent pronouncement thereafter is that of Pius PP XII in his encyclical, <u>De Lege</u>, October 5, 1958.  Both have the same relevance here.  They poignantly teach that an overarching responsibility of any judicial officer is to administer justice tempered with wisdom and mercy.  When a patently unjust result stems from a stiff or mechanical application of a general rule, requirements of justice demand that a "true man of law" consider whether there is a permissible interpretation that promotes a "higher welfare."

*I know it when I see it . . .*

*Legislators have to use common sense . . .*
*and give judges some flexibility . . . .*
*The best place to make sure the punishment fits the crime*
*is in the courthouse, not the statehouse.*

───────────────────────────

In <u>Jacobellis v. Ohio</u>, the Supreme Court of the United States grappled with trying to define "hard-core pornography."  Justice Stewart, concurring, characterized the task as "trying to define what is indefinable."  Nevertheless he made the pithy and profound observation, "I know it when I see it . . . ."  <u>Jacobellis v. Ohio</u>, 378 U.S. 184, 197 (1964).

The second quotation above comes from a recent newspaper editorial in the <u>Beaumont Enterprise</u>, December 7, 2007.  Together, the two statements reflect the ultimate nitty-gritty of how Dr. Ramnath's motion for release must be decided.  The

undersigned, having considered all the evidence at length, is best-positioned to determine whether a special circumstance warranting pre-hearing release has been shown.  And, after almost a quarter century of deciding on a daily basis whether a person is entitled to bail, the undersigned should know an appropriate case when he sees it.

This is such a case.  Nothing beyond the naked presumption for detention counsels the court to keep Dr. Ramnath confined with the customary contingent of "crackheads," crazies, and miscreants who usually inhabit dank county jails.  On the other hand, every rational concern augurs for her release.  Her husband and minor children need their wife and mother.  Critically ill patients could benefit were she available.  She is not a risk of flight.  This matter, therefore reflects "most pressing circumstances" where "requirements of justice are absolutely peremptory."

Dr. Ramnath's motion for release will be granted.

## CONCLUSION

For the foregoing reasons, respondent's motion for bail will be granted.  An appropriate order will be entered separately.

SIGNED this  11   day of January, 2008.

_Earl S. Hines_

Earl S. Hines
United States Magistrate Judge